# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

RICHARD CLAIRMONT,

    Plaintiff,

v.

JONI WILSON, in her individual capacity,

    Defendant.

C08-507Z

ORDER

THIS MATTER comes before the Court on defendant Joni Wilson's motion for summary judgment, docket no. 122. Having reviewed all papers filed in support of and in opposition to the motion, and having heard the arguments of counsel, the Court GRANTS Ms. Wilson's motion and DISMISSES plaintiff's complaint WITH PREJUDICE.

**Background**

From December 2005 to late November 2007, plaintiff Richard Clairmont worked as a counselor and manager for Sound Mental Health, an agency providing domestic violence perpetrator treatment ("DVPT"). Clairmont Decl. at ¶¶ 3-4 (docket no. 135); Exh. 14 to Wing Decl. (docket no. 140); Wilson Decl. at ¶ 4 (docket no. 125). All DVPT providers must be certified by the Washington Department of Social and Health Services ("DSHS").

ORDER - 1

1 *See* RCW 26.50.150; WAC 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. All such state-certified agencies are placed on a list distributed by the Probation Unit of the Seattle Municipal Court to individuals who, as a condition of their sentence or deferred prosecution[1] for a domestic violence offense, must complete DVPT. Dotson Decl. at ¶ 13 (docket no. 126); *see* Exh. F to Wilson Decl. (docket no. 125-3). Such individuals may choose any of the treatment providers on the list, and probation officers generally do not make specific referrals, but they might point out certain relevant factors, such as the location of the agency, whether the agency offers services to particular groups, for example, Spanish-speakers or homosexual men, whether the agency has a "sliding fee," or whether the agency accepts medical coupons. Dotson Decl. at ¶ 13 (docket no. 126); *see also* Wilson Dep. at 48:3-8, Exh. 3 to Wing Decl. (docket no. 139); Dotson Dep. at 163:15-23, Exh. C to Overbey Decl. (docket no. 123-2).

Sound Mental Health is on the Probation Unit's list of state-certified agencies, but it also has a unique relationship with the City of Seattle and the Seattle Municipal Court. Sound Mental Health is the only DVPT provider that has a contract with the City of Seattle, pursuant to which office space and equipment at the Seattle Justice Center, the building that houses the Seattle Municipal Court, is made available to the agency so it can provide "on-site" treatment services to "members of the public." *See* Wilson Decl. at ¶ 5 & Exh. A (docket no. 125 & 125-2). The agreement provides that Sound Mental Health will act as a consultant to the Probation Unit and requires that Sound Mental Health staff the "Court Resource Center" in the Seattle Justice Center for at least 40 hours per week. Under the agreement, neither party makes any direct payments to the other party, but the relationship of Sound Mental Health to the City of Seattle is expressly defined as "that of an independent contractor." Exh. A to Wilson Decl. at §§ 4 & 12 (docket no. 125-2 at 2 & 9).

---

[1] Seattle Municipal Court employs a form of deferred prosecution known as a stipulated order of continuance ("SOC"), pursuant to which an accused person may voluntarily complete DVPT and comply with other conditions in exchange for the eventual dismissal of charges. *See* Exh. M to Overbey Decl. (docket no. 123-3); *see also Koenig v. City of Lakewood*, 2009 WL 1864001 (Wash. Ct. App.) (briefly describing the contours of an SOC for purposes of deciding a related public records request).

ORDER - 2

Since March 2007, defendant Joni Wilson has held the position of Manager of Probation Services for the Seattle Municipal Court. Wilson Decl. at ¶ 1 (docket no. 125). Ms. Wilson supervises both the Domestic Violence Probation Unit and the Mental Health Probation Unit. *Id.* at ¶ 2. Tonya Dotson is a probation counselor in the Domestic Violence Probation Unit. <u>See</u> Dotson Decl. at ¶¶ 1 & 2 (docket no. 126). On November 8, 2007, Ms. Dotson was present when Mr. Clairmont testified during a hearing to determine the appropriate sanction, if any, for a criminal defendant's premature termination from DVPT, in which the defendant was required to be enrolled pursuant to an SOC. Exh. 5 to Wing Decl. (docket no. 139-2 at 13); Dotson Decl. at ¶ 14 (docket no. 126); <u>see also</u> Exh. M to Overbey Decl. (docket no. 123-3). At the time, neither Sound Mental Health nor Mr. Clairmont were providing services to the criminal defendant, who had been in DVPT at a different agency, namely Consejo Counseling and Referral Services ("Consejo"). <u>See</u> Dotson Decl. at ¶ 14 (docket no. 126).

Mr. Clairmont was not called as a fact witness; rather, he had been subpoenaed by the defendant's attorney to testify in the capacity of an expert witness. <u>See</u> Wilson Decl. at ¶ 13 (docket no. 125); Exh. 18 to Wing Decl. (docket no. 139-3). Based on Mr. Clairmont's testimony, Ms. Dotson formed the opinion that Mr. Clairmont's treatment philosophy differed from the one employed by the counselor at Consejo who had terminated the defendant from DVPT. Dotson Decl. at ¶ 14 (docket no. 126). Ms. Dotson subsequently informed Ms. Wilson about Mr. Clairmont's testimony. <u>See</u> Wilson Decl. at ¶ 13 (docket no. 125).

After learning of the testimony, Ms. Wilson listened to an audio recording of the hearing. She concluded that the testimony raised questions concerning whether Mr. Clairmont was complying with DSHS regulations and holding his own DVPT clients accountable for failing to attend treatment sessions and/or for persisting in victim-blaming beliefs or conduct. Ms. Wilson subsequently had conversations with Mr. Clairmont's

supervisor, Declan Wynne, and corresponded with Mr. Wynne via e-mail concerning Mr. Clairmont. *Id.* at ¶¶ 14-15. In late November 2007, during a meeting with Mr. Wynne and Karen Floyd, Sound Mental Health's Human Resources Manager, Mr. Clairmont was informed that he was being "fired" or "dismissed." Clairmont Dep. at 189:14-190:14, Exh. H to Overbey Decl. (docket no. 123-3); <u>see also</u> Floyd Dep. at 4:24, 111:24-112:14, Exh. 8 to Wing Decl. (docket no. 139-2). According to Mr. Clairmont, Mr. Wynne told him the termination was "[b]ecause of what you said in court," and "because of what was going on in your groups." Clairmont Dep. at 190:16 & 18-19, Exh. H to Overbey Decl. (docket no. 123-3). Mr. Clairmont was provided a letter of termination, which he tore up and placed on Mr. Wynne's desk. *Id.* at 191:7 & 193:22. The letter, dated November 29, 2007, was signed by Sound Mental Health's Chief Executive Officer David Stone, and read in relevant part:

> Sound Mental Health has very recently received further critical feedback from the City of Seattle Domestic Violence Probation Officers Unit about your performance and program management. Your advocacy for clients remains strong. However, prior attempts to improve accountability, care coordination and restore confidence in your management of the program with the probation unit have been unsuccessful. The unit reports they have lost trust in the integrity of the program and consider that the situation is not salvageable. The program is in jeopardy. They have proposed a stop-referral beginning immediately. This leaves SMH with no option but to terminate your employment effective today . . . .

Exh. 14 to Wing Decl. (docket no. 140).

Based on Mr. Clairmont's recollection of Mr. Wynne's statements concerning the basis for discharge, as well as Mr. Stone's letter, Mr. Clairmont alleges that Ms. Wilson retaliated against him for testifying and exercising his right of free speech by threatening Sound Mental Health that it would cease receiving DVPT referrals from the Probation Unit. Ms. Wilson disputes this assertion, and provides evidence that she voiced concerns about Mr. Clairmont's performance long before his November 2007 testimony. *See* Wilson Decl. at ¶¶ 9-12 & Exh. H (docket nos. 125 & 125-3); Dotson Decl. at ¶¶ 5-12 & Exhs. A & B (docket nos. 126 & 127). Ms. Wilson indicates that she received negative reports from probation officers about Mr. Clairmont as early as March 2007, and that she met with

ORDER - 4

Mr. Wynne in August 2007 to discuss her concerns. Wilson Decl. at ¶¶ 9 & 11 (docket no. 125). Moreover, Ms. Wilson denies threatening Mr. Wynne or anyone else at Sound Mental Health with a "stop-referral." *Id.* at ¶¶ 16 & 17. Ms. Wilson explains that she has no authority to issue such an edict and that only a judge could remove a DVPT provider from the list distributed by the Probation Unit. *Id.* at ¶ 16; *see also* Dotson Dep. at 162:7-8, 163:8-11, 166:13-24, Exh. 23 to Wing Decl. (docket no. 139-3).

In early December 2007, the attorney who had subpoenaed Mr. Claimont, Karen Baker of Associated Counsel for the Accused, and two of her colleagues, sent a letter to Seattle Municipal Court Judges Ron Mamiya and Fred Bonner, expressing "dismay" over the "chilling effect" of the Probation Unit's actions with respect to Mr. Clairmont. Exh. 18 to Wing Decl. (docket no. 139-3). Judge Mamiya responded by letter dated December 19, 2007, advising Ms. Baker that he had "thoroughly reviewed this matter." Exh. 21 to Wing Decl. (docket no. 139-3). Based on his investigation, Judge Mamiya opined that "the contact(s) between Ms. Wilson (and others in PSD) and Mr. Wynne about Mr. Clairmont's performance had occurred over an extended period of time prior to their most recent contact, which followed Mr. Clairmont's testimony on November 8th," and that "Mr. Clairmont's discharge from Sound Mental Health was not the result of his November 8th testimony but an accumulation of a series of concerns that were addressed with him by Sound Mental Health for a substantial period of time." *Id.*

In April 2008, Mr. Clairmont initiated this lawsuit against Ms. Wilson pursuant to 42 U.S.C. § 1983 and against Sound Mental Health pursuant to Washington law. Complaint (docket no. 1). Mr. Clairmont has since settled all claims against his former employer, and Ms. Wilson is the only remaining defendant. *See* Order (docket no. 97). She now seeks summary judgment on the basis of qualified immunity.

**Discussion**

**A.     Summary Judgment Standard**

The Court should grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a properly supported motion for summary judgment has been presented, the adverse party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2). Rather, the non-moving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial. *Id.*; *Anderson*, 477 U.S. at 256. All "justifiable inferences" are to be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255. When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006).

**B.     Qualified Immunity**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* To assess whether a government official sued in his or her individual capacity is entitled to qualified immunity, the Court must engage in two inquiries: (i) whether the plaintiff has adequately alleged a violation of a constitutional right; and (ii) whether the right at issue was "clearly established" at the time of its alleged violation.

*See, e.g.*, *id.* at 815-16. If the answer to either of these questions is "no," then the government official is entitled to qualified immunity, which is an immunity from suit, and not merely a defense to liability. *See id.* The Court may conduct these two analytic steps in the sequence that "will best facilitate the fair and efficient disposition" of the case. *Id.* at 821; *see also id.* at 816-21 (overruling the "rigid order of battle" mandated in *Saucier v. Katz*, 533 U.S. 194 (2001)).

To be considered "clearly established" for purposes of the qualified immunity doctrine, the constitutional right at issue must be sufficiently "particularized" and its contours sufficiently clear that "a reasonable official would understand that what he [or she] is doing violates that right." *Moran v. Washington*, 147 F.3d 839, 844-45 (9th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). As recognized by the Supreme Court in *Pearson*, deciding whether a right is "clearly established" is often difficult without first assessing "precisely what the constitutional right happens to be." 129 S. Ct. at 818 (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)). In contrast, in some cases, reaching the conclusion that a constitutional right is not "clearly established" proves relatively easy because the existence of the right remains so far from obvious. *Id.* In the instant case, the scope or existence of the right at issue and, as a consequence, whether the right is "clearly established," depend on how the relationship between the parties is characterized.

### 1. Existence of a Public Employment Relationship

In general, the government as employer has far broader authority to restrict expression than the government as sovereign. *See Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 978 (9th Cir. 1998) (citing *Waters v. Churchill*, 511 U.S. 661 (1994)); *see also City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) ("a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public"); *Pickering v. Bd. of Educ. of Township*

*High School Dist. 205*, 391 U.S. 563, 568 (1968) ("the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general"). For purposes of First Amendment claims against governmental officials, whether the plaintiff has a direct employment or an independent contractor relationship with the government makes no difference; the same standards apply. *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668 (1996). As explained in *Umbehr*, the government "needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Id.* at 674. As a result, in *Umbehr*, the Supreme Court concluded that "[i]ndependent government contractors are similar in most relevant respects to government employees . . . . [and] the same form of [First Amendment] balancing analysis should apply to each." *Id.* at 684-85.

     In this case, during the latter portion of Mr. Clairmont's tenure with Sound Mental Health, the agency entered into a written agreement with the City of Seattle that explicitly denominated the agency as an independent contractor. Nevertheless, Mr. Clairmont contends that, when he testified in November 2007, he did so as "an ordinary citizen" entitled to greater First Amendment protection than a government employee or contractor. Mr. Clairmont's argument lacks merit. The relationship between Mr. Clairmont and the Probation Unit "implicates governmental interests similar to those involved in the public employment context." *See Kinney v. Weaver*, 367 F.3d 337, 360 (5th Cir. 2004). The Probation Unit is tasked with *inter alia* monitoring criminal defendants who have been convicted of a domestic violence offense or who have entered into an SOC and must, as a result, complete DVPT. *See* Wilson Decl. at ¶¶ 3 & 7 (docket no. 125). The Probation Unit's primary concern is victim safety, and it must take appropriate action whenever a criminal defendant poses a risk to victim safety by failing to comply with treatment requirements. Wilson Decl. at ¶¶ 6-8 & 21 (docket no. 125); Dotson Decl. at ¶¶ 2-4

(docket no. 126); Wilson Dep. at 126:16-22, Exh. F to Overbey Decl. (docket no. 123-3); <u>see</u> WAC 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 ("primary goal" of a DVPT program "must be to increase the victim's safety"); <u>see also</u> <u>Danny v. Laidlaw Transit Servs., Inc.</u>, 165 Wn.2d 200, 205, 193 P.3d 128 (2008) (Washington has "a clear mandate of public policy of protecting domestic violence survivors and their families and holding their abusers accountable"). Lack of adequate probationer supervision on the part of the Probation Unit can lead to deleterious and potentially lethal consequences, for which the City of Seattle can potentially be held civilly liable. Wilson Decl. at ¶ 8 (docket no. 125); Wilson Dep. at 77:13-19, Exh. 3 to Wing Decl. (docket no. 139); <u>see</u> <u>Hertog v. City of Seattle</u>, 138 Wn.2d 265, 281, 979 P.2d 400 (1999) ("the City and its probation counselors have a duty to control municipal court probationers to protect others from reasonably foreseeable harm resulting from the probationers' dangerous propensities").

The Probation Unit relies on DVPT providers to keep it advised about the progress (or lack of progress) that their clients are making in treatment. <u>See</u> Wilson Decl. at ¶ 7 (docket no. 125); Dotson Decl. at ¶ 4 (docket no. 126). If a DVPT provider fails to report a probationer's recalcitrance, which might be manifested by <u>inter alia</u> unexcused absences from treatment sessions or prolonged resistance to counseling efforts, <u>see</u> Wilson Dep. at 59:11-25, Exh. 3 to Wing Decl. (docket no. 139), or cannot accurately assess a probationer's progress in treatment, then the Probation Unit's ability to convey meaningful information to the judges of the Seattle Municipal Court and fulfill its duties with regard to victim and community safety is compromised. Thus, the Probation Unit has a substantial interest in ensuring that DVPT providers are competent, compliant with DSHS regulations, and responsive to the Probation Unit's needs.

This case is similar to <u>Kinney</u>, in which the Fifth Circuit held that the plaintiffs' relationship with the defendants was analogous to that of a government employee. 367 F.3d at 360-61. In <u>Kinney</u>, the two plaintiffs were instructors at a police academy. The plaintiffs

testified as expert witnesses on behalf of the family of a teenager who had been killed by a police sniper. The defendants were county sheriffs and police chiefs who, in response to the plaintiffs' testimony, boycotted the plaintiffs' academy classes, effectively reducing enrollment in the plaintiffs' classes below an economically viable level and forcing one of the plaintiffs to resign and the other to be reassigned to a less lucrative teaching position. The Fifth Circuit observed that "[l]aw enforcement agencies have a legitimate interest in exercising discretion over the choice of the instructors who train the officers who will, in turn, carry out the agencies' public duties." *Id.* at 360. This governmental interest is of the type the First Amendment jurisprudence concerning public employment was designed to protect, namely the interest "in promoting the efficiency of the public services [the governmental agency] performs." *Id.* at 360-61 (quoting *Pickering*, 391 U.S. at 568). In comparison, the relationship between Mr. Clairmont and the Probation Unit was even closer to one of employment, and the analysis in *Kinney* provides strong support for the conclusion that the standards applicable to free speech claims brought by public employees and contractors apply in this case.[2]

---

[2] The cases cited by Mr. Clairmont do not compel a different result. For example, in *Helvey v. City of Maplewood*, 154 F.3d 841 (8th Cir. 1998), the plaintiff had been a bartender, who had witnessed an incident between four police officers and two individuals and subsequently testified on behalf of the individuals during the course of their criminal prosecution and federal civil rights action. *Id.* at 843. In *Helvey*, the Eighth Circuit was not called upon to address whether the public employment standard applied to the plaintiff's free speech claim; the defendants apparently did not identify any governmental interests in the bartender's work or employment, but rather simply denied knowing that the plaintiff had testified and denied playing any role in her discharge. *Id.* at 843-44 (holding that a "factual dispute" precluded summary judgment). Thus, *Helvey* provides no guidance. Similarly, *Blackburn v. City of Marshall*, 42 F.3d 925 (5th Cir. 1995), offers little help to Mr. Clairmont. *See id.* at 933 (holding in a conclusory fashion that the plaintiff, a tow truck operator, who was removed from the local government's rotation list and whose permission to use the police radio frequency was revoked after he complained about the bidding process for ancillary work, did not have "even a quasi-employment relationship" with the local government). Moreover, although *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), fully discusses the issue, it is still of little assistance because the facts are distinguishable. In *Worrell*, the plaintiff was a former agent with the Federal Bureau of Investigation ("FBI"), who testified as an expert witness concerning FBI procedures on behalf of a defendant in a capital murder case, and who was subsequently denied a position in a district attorney's office as the coordinator of a drug task force. The Tenth Circuit held that the public employment standard applied to the district attorney's decision not to hire the plaintiff but not to the activities of the members of the Oklahoma Bureau of Narcotics and Dangerous Drugs ("OBNDD"), who refused to work with the plaintiff. Unlike Mr. Clairmont, the plaintiff in *Worrell* had a direct public employment relationship, albeit only a

## 2.     **Elements of First Amendment Claim By Public Employee**

In the public employment context,[3] a plaintiff claiming a First Amendment violation must establish that (i) the plaintiff spoke on a matter of public concern; (ii) the plaintiff spoke outside his or her capacity as a government employee or contractor; and (iii) the plaintiff's speech was a substantial or motivating factor in an adverse employment action. *Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009). If the plaintiff proves these three elements, the burden passes to the government to show that either (i) the government's administrative interests outweigh the plaintiff's interest in commenting on the matters at issue,[4] or (ii) the government would have reached the same adverse employment decision even in the absence of the plaintiff's exercise of free speech. *Id.* at 1070, 1071-72; *see also* *Gilbrook v. City of Westminster*, 117 F.3d 839, 867 (9th Cir. 1999).

In this case, Ms. Wilson contends that Mr. Clairmont has failed to demonstrate the three elements on which he bears the burden of proof. As to the first element, Ms. Wilson asserts that Mr. Clairmont's testimony did not touch upon a matter of public concern, but rather merely described his own approach as a DVPT provider. In analyzing whether Mr. Clairmont's speech was of public concern, the Court observes that the Ninth Circuit has not decided whether to (i) adopt the approach of the Third and Fifth Circuits, which ascribe public concern to a government employee's courtroom testimony regardless of its content, or (ii) follow the Fourth, Seventh, Eighth, and Eleventh Circuits, which have eschewed such per

---

prospective one, with the district attorney's office; he could not have had two different government employers, and the OBNDD was properly viewed as merely exercising a "heckler's veto," *id.* at 1210, which is not entitled to the same deference owed to a governmental employer's decisions.

[3] In light of its holding, the Court need not address whether, if Ms. Wilson had been mistaken, she would nevertheless have been reasonable in perceiving her relationship with Mr. Clairmont to be sufficiently similar to that of public employment to warrant the actions at issue. In addition, the Court is not required to, and declines to, analyze whether Mr. Clairmont could, if he were treated as an ordinary citizen, defeat Ms. Wilson's assertion of qualified immunity.

[4] Although the government bears the burden in the balancing analysis, the Ninth Circuit has made clear that "*no* expression [by a public employee] is deemed 'constitutionally protected' until its value has been determined to outweigh the relevant government interests." *Moran*, 147 F.3d at 848 (emphasis in original).

se rule. *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926 n.6 (9th Cir. 2004). This Court has struggled with the issue, recognizing as others have that our judicial system is premised on witnesses upholding the duty to testify truthfully and that an individual who fears reprisal, whether it be from an employer or other source, might be inhibited from exercising the requisite candor. *See* *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1100-01 (5th Cir. 1987); *see also* *Green v. Phila. Housing Auth.*, 105 F.3d 882, 886-87 (3d Cir. 1997); *Pro v. Donatucci*, 81 F.3d 1283, 1289-91 (3d Cir. 1996); *compare* *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1505 (7th Cir. 1994) ("surely an employee summoned to give sworn testimony in a judicial proceeding has a compelling interest in testifying *truthfully*" (emphasis in original)). The Court is also mindful that Mr. Clairmont's testimony was compelled by subpoena and that First Amendment principles should be applied even more fervently when the speech alleged to have been penalized was not itself volunteered. Ultimately, however, because this case may be resolved on another basis, the Court does not view it as the proper vehicle for deciding whether the context of a courtroom appearance automatically raises speech to the level of public concern.

Although the Court makes no ruling concerning whether the content of the testimony must be considered in addition to its context, the Court finds that the topics covered during Mr. Clairmont's testimony are not matters of public concern. During the hearing on November 8, 2007, Mr. Clairmont was asked a series of hypothetical questions by both the criminal defendant's attorney, Ms. Baker, and the Assistant City Attorney:

> Q    (By Ms. Baker) Mr. Clairmont, I want to give you a hypothetical. Let's say you had in your sessions an individual who began treatment in March of 2007 and that individual attended all their weekly sessions. And then in August you met with that individual and you talked to that individual, and after talking to that individual, you determined that that individual was not -- was blaming the victim, was not taking responsibility for their behavior, denied using physical violence in the incident which had brought him to domestic violence treatment, clearly said there was nothing to change, did not feel he needed treatment. What would you do in that circumstances [sic]?
>
>      . . . .

ORDER - 12

|   |   |   |
|---|---|---|
| 1 | A | I would be conferring, I presume, with probation. And I would also consider that I had more work to do. |
| 2 |   | . . . . |
| 3 | Q | So would you terminate a client in that scenario? |
|   | A | With the rest of the compliance being in order? |
| 4 | Q | Yes. So what the -- the information you have is they started treatment in March? |
| 5 |   |   |
| 6 | A | Yes. |
|   | Q | They've been going to their session? |
| 7 | A | Yes. |
| 8 | Q | Going to their sessions on time. But still five months later, they're saying I don't need treatment; it's her fault; I didn't do anything wrong? Would you terminate? |
| 9 |   |   |
| 10 | A | I'd figure I'd have more -- I'd figure I had more work to do and the answer is no. Unless there were other clear obvious compliance issues. I mean, if people aren't showing up for group, that's really an indicator for . . . |
| 11 |   |   |
| 12 |   | . . . . |
|   | A | That's an indicator for termination, I would say. |
| 13 |   | . . . . |
| 14 |   | CROSS-EXAMINATION |
|   | BY MS. STATEN-SYLVESTER |
| 15 | Q | What if a client is showing up to group but not getting anything out of group? Is that okay with your treatment plan? |
| 16 |   |   |
| 17 | A | I -- it would show me that I had more work to do. I don't -- I don't -- it's not my experience that clients don't get anything out of my groups. |
| 18 |   | . . . . |
| 19 | Q | Okay. So can someone who is paying on time, showing up to group and basically there, their body is there, but who's still in denial, who still blames the victim, who still does not accept responsibility for their actions and who still is not being held accountable for their actions, can that person then be terminated from your treatment. |
| 20 |   |   |
| 21 | A | That doesn't happen in my groups. |
| 22 | Q | Okay. If that did happen, just as -- counsel gave you a hypothetical. This is a hypothetical. If that happened to you, would you terminate that person? |
| 23 |   |   |
| 24 | A | I would consider that I had more work to do. |

Tr. at 39:1-43:16, Exh. E to Overbey Decl. (docket no. 123-2). As illustrated by the quoted passages, Mr. Clairmont's testimony consisted primarily of speculation concerning his

ORDER - 13

clinical response to certain imagined scenarios. It was offered in the context of a particular individual seeking to avoid sanctions for being expelled from a DVPT program. The testimony did not bring to light any malfeasance on the part of the Probation Unit, the Seattle Municipal Court, or the City of Seattle, and it did not even purport to provide any criticisms, or recommendations for improvement, of the locality's approach to the problem of domestic violence. Thus, Mr. Clairmont's testimony was primarily of a private, and not a public, nature. *See Maggio v. Sipple*, 211 F.3d 1346, 1352 (11th Cir. 2000) ("'[a]n employee's speech will rarely be entirely private or entirely public'" and "the relevant inquiry is 'whether the purpose of [the plaintiff's] speech was to raise issues of public concern . . . or to further her own private interest'" (insertions in original, quoting *Morgan v. Ford*, 6 F.3d 750, 754-55 (11th Cir. 1993))).

If content, in addition to context, must be considered in assessing whether a public employee's testimony is imbued with public concern, then the speech here at issue cannot support a First Amendment claim. On that basis alone, the Court would grant Ms. Wilson qualified immunity. Given the current debate, however, concerning the appropriate test for public concern in the context of a courtroom appearance, the Court will not rest on its evaluation of Mr. Clairmont's testimony as predominantly private in content, but will instead move on to an analysis of the remaining elements. With regard to the second element, Ms. Wilson contends that, in testifying about his practices as a DVPT provider, Mr. Clairmont was speaking as part of his official duties, rendering his expression wholly unprotected by the First Amendment. This issue involves questions of fact. *See Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008) (holding that "the determination whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of fact and law" and that disputes concerning "the scope and content of a plaintiff's job responsibilities" are to be resolved by a trier of fact). The analysis might be different if Mr. Clairmont had been testifying on behalf of (or perhaps

ORDER - 14

adversely to) one of his own DVPT clients, but Ms. Wilson has not demonstrated an absence of factual dispute, as required of the moving party, concerning whether testimony offered to contradict the treatment (or termination of treatment) decision of another DVPT provider fell within the scope of Mr. Clairmont's responsibilities as manager of Sound Mental Health's DVPT program.

As to the third element on which Mr. Clairmont bears the burden of proof, the Court finds that genuine issues of material fact exist. The parties dispute whether Ms. Wilson's comments to Mr. Wynne about Mr. Clairmont's testimony constituted a substantial or motivating factor in Mr. Clairmont's discharge. Ms. Wilson contends that she first complained about Mr. Clairmont months before he testified and that she made no "stop-referral" threats and did not suggest termination to Sound Mental Health. In contrast, Mr. Clairmont relies on the statements Mr. Wynne allegedly made during the course of firing him, as well as on the dismissal letter signed by Mr. Stone, which together tend to indicate that Mr. Clairmont's testimony and the fear of reprisal from the Probation Unit were factors in Sound Mental Health's adverse employment decision. Thus, all three of the elements Mr. Clairmont must establish implicate either unsettled law or factual disputes and, as a result, the Court must continue on to a consideration of the balancing test on which Ms. Wilson bears the burden of proof.

### 3. **Balancing of Interests**

As a preliminary matter, the Court notes that, with respect to the so-called *Pickering* balancing of interests, the Court need not definitively resolve the merits of Mr. Clairmont's claim. Rather, the Court is faced with the "'much simpler task,'" of deciding whether such balancing "so clearly favors" Mr. Clairmont that his right to speak as he did was sufficiently "clearly established" to defeat Ms. Wilson's assertion of qualified immunity. *See Brewster*, 149 F.3d at 981 (quoting *Moran*, 147 F.3d at 850). In undertaking its application of the *Pickering* test, the Court is cognizant of the Ninth Circuit's repeated admonitions that such

analysis "requires a fact-sensitive, context-specific balancing of competing interests" and that "the law regarding public-employee free speech claims will 'rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity.'" *Brewster*, 149 F.3d at 980 (quoting *Moran*, 147 F.3d at 847, and citing cases from the First, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits); see also *Gilbrook*, 177 F.3d at 867.

With the nature of its task and the jurisprudential landscape in mind, the Court begins its *Pickering* analysis by reiterating the minimal value of Mr. Clairmont's speech. *See Moran*, 147 F.3d at 849 (a government "employee's prerogative to speak is 'protected' only if the value of the speech outweighs the costs imposed by the speech"). His testimony was offered in the context of an SOC revocation hearing involving one particular criminal defendant as to whom Mr. Clairmont had not provided DVPT services and about whose case Mr. Clairmont offered only hypothetical opinions. Mr. Clairmont's speech differed significantly from the types of expressions that have persuaded courts in other cases to tip the *Pickering* scale in the public employee's favor. For example, in *Eng*, the plaintiff authored a report that cleared individuals associated with a construction project of wrongdoing and recommended against pursuing criminal charges. 552 F.3d at 1064-65. The plaintiff's report was met with hostility and retaliatory actions by the plaintiff's superiors, who had publicly promised reform and deliverance of "slam dunk" indictments. *Id.* at 1064-66. The defendants in *Eng* did not even try to argue that they had any legitimate interests in regulating the plaintiff's speech, and the Ninth Circuit concluded that the defendants had not met their burden under the *Pickering* test. *Id.* at 1074.

Likewise, in *Gilbrook*, the Ninth Circuit held that the balance of interests "clearly" weighed in favor of the plaintiff, a firefighter who had issued a press release in the wake of a residential fire in which a child had died, stating in part: "This tragedy is the direct result of the Mayor and [City] Council placing politics above the safety of the people." 177 F.3d at 850 (insertion in original). The Ninth Circuit commented that "an opinion about the

ORDER - 16

preparedness of a vital public-safety institution, such as a fire department, goes to the core of what constitutes speech on matters of public concern." *Id.* at 866. A similar result was reached in *Alpha Energy*, in which the plaintiff, the president of a company that contracted with Multnomah County to provide "weatherization" services for low-income residents, testified on behalf of a former county employee, who had alleged that his discharge was rooted in discrimination on the basis of age and race. 381 F.3d at 921. The Ninth Circuit observed that speech concerning government "corruption, wrongdoing, misconduct, wastefulness, or inefficiency," as well as "invidious discrimination," whether "a single act or a pattern of conduct," is "inherently a matter of public concern." *Id.* at 926. The *Alpha Energy* Court concluded that the public's "strong interest" in the plaintiff's expressive conduct outweighed the defendants' interests in an efficient weatherization program, which the Court could not conceive was impacted by the plaintiff's testimony and which "would not have been advanced in any way by [the plaintiff] remaining silent on the subject of race or age discrimination." *Id.* at 930.

Unlike in *Eng*, *Gilbrook*, and *Alpha Energy*, in this case, the public utility of the speech at issue is unclear. At most, Mr. Clairmont's testimony expressed disagreement with the decision of another DVPT provider to terminate a particular criminal defendant from its program. The value of such predominantly private speech does not so clearly outweigh the government's interests as to thwart Ms. Wilson's request for qualified immunity. Although Mr. Clairmont's expert opinion appears not to have swayed the judge presiding over the SOC revocation hearing, *see* Bonner Dep. at 21:6-9, Exh. 24 to Wing Decl. (docket no. 139-3) ("I could have made a decision without Mr. Clairmont's testimony, but you cannot tell defense counsel that you don't need them to present a witness"), the testimony had broader ramifications for the Probation Unit because it reflected how Mr. Clairmont was running the Sound Mental Health DVPT program. Mr. Clairmont was not just one of several counselors; he was the manager of the DVPT program at the one agency designated to provide on-site

services. Thus, the Probation Unit had a substantial stake in rectifying the perceived noncompliance with DSHS regulations[5] and addressing its concerns about victim safety and civil liability. Having performed the *Pickering* balancing, the Court cannot conclude that a reasonable government official in Ms. Wilson's position would have believed warnings to Sound Mental Health, even strongly worded or threatening ones, violated Mr. Clairmont's First Amendment right.[6] *Cf.* Worrell, 219 F.3d at 1208 (observing that a government official is "not obligated to wait for an actual breakdown" before taking action, but rather is entitled to rely on "reasonable predictions of workplace disruption").

The Court is not unsympathetic to Mr. Clairmont's situation. Taking the facts in the light most favorable to him, as the Court must in the context of the pending motion for summary judgment, his termination seems an extraordinarily harsh remedy for the allegedly improper opinions he expressed. This case, however, does not involve any "whistle blowing" on Mr. Clairmont's part, and it identifies no archetypical government official

---

[5] The Court need not, and does not, assess the accuracy of Mr. Clairmont's testimony or its consistency with DSHS regulations. Whether the circumstances outlined in the hypothetical questions posed to Mr. Clairmont would require a DVPT provider to terminate a client from the program is not relevant. Rather, the issue before the Court is simply whether the Probation Unit had an interest that was affected by the answers Mr. Clairmont gave.

[6] Mr. Clairmont contends that a Washington statute criminalizing threats directed to former, current, or prospective witnesses put Ms. Wilson sufficiently on notice that her complaints to Sound Mental Health violated Mr. Clairmont's right to free speech. Mr. Clairmont's argument is unpersuasive. The statute he cites defines the class B felony of intimidating a witness, which can occur if a person "directs a threat to a former witness because of the witness's role in an official proceeding." RCW 9A.72.110(2). The term "threat" means to "communicate, directly or indirectly, the intent" to (i) immediately use force "against any person who is present at the time" or (ii) accomplish an act enumerated in RCW 9A.04.110(27), including one intended to substantially harm the witness's "health, safety, business, financial condition, or personal relationships." RCW 9A.72.110(3)(a); RCW 9A.04.110(27)(j). Because RCW 9A.72.110 criminalizes certain expression, for it to be facially constitutional, the statute must distinguish between "true" threats and protected speech. *See* *State v. King*, 135 Wn. App. 662, 669, 145 P.3d 1224 (2006). Even violent statements constitute protected speech if they are merely "innocent blather," jokes, or "puffery." *Id.* In contrast, a "true" threat exists "if the speaker would reasonably foresee under the circumstances that the listener would believe he or she will be subject to physical violence." *Id.* Mr. Clairmont does not suggest that Ms. Wilson indicated any intent to use force or to injure Mr. Clairmont in any manner, physically or pecuniarily. Indeed, Mr. Clairmont has provided no basis for believing that Ms. Wilson's statements to Sound Mental Health were anything other than protected speech, which is beyond the reach of RCW 9A.72.110. Thus, neither the statute nor the authorities interpreting it provided Ms. Wilson any notice that the concerns she expressed about Mr. Clairmont's testimony would give rise to either criminal sanctions or civil liability.

ORDER - 18

seeking to punish an individual for speaking out against the official or contrary to some governmental policy. Instead, this case reveals the kind of earnest governmental activity leading to an unanticipated negative consequence that the qualified immunity doctrine was designed to insulate from liability.

**Conclusion**

For the foregoing reasons, the Court concludes that the nature of the relationship between Mr. Clairmont and the Probation Unit limited Mr. Clairmont's First Amendment right to that of a public employee. Having balanced the minimal value of Mr. Clairmont's speech on matters of only private concern against the implications of such speech on the Probation Unit's strong interests, the Court holds that the scope of Mr. Clairmont's First Amendment right was not so "clearly established" as to preclude qualified immunity for Ms. Wilson. The Court therefore GRANTS summary judgment in favor of Ms. Wilson and DISMISSES this action with prejudice.

IT IS SO ORDERED.

The Clerk is directed to enter judgment consistent with this Order and to send a copy of this Order to all counsel of record.

DATED this 27th day of August, 2009.

Thomas S. Zilly
United States District Judge